UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN CHARLES,

       Plaintiff,

v.

       CASE NO. 17-CV-10376
       HON. GEORGE CARAM STEEH

MEDTEST DX, INC.,

       Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 15)**

Plaintiff Martin Charles, an African American and native of Guyana, who worked for defendant MedTest DX, Inc. ("MedTest") for about five years in various positions, lastly as a technical service manager, brought this race and national origin discrimination suit under Title VII, 42 U.S.C. § 2000e-2(a)(1) and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, *et seq.* arising out of his termination. MedTest allegedly discharged him for poor performance, improper outside part-time employment which posed a conflict-of-interest, and his refusal to participate in a performance review process with his peers. Charles also alleges retaliation for allegedly complaining of racial discrimination to

-1-

human resources personnel shortly before his termination. Now before the court is MedTest's motion for summary judgment. Oral argument was heard on June 4, 2018 and informs the court's decision here. For the reasons set forth below, Defendant's motion for summary judgment shall be granted.

## I. Background

The facts as set forth below are construed in favor of the non-moving party, here Charles. In 2008, Charles began working for Polymedco as a clinical technical services representative. His duties included answering customers calls, assisting with technical problems, validating quality control material, and assisting quality assurance. Charles would install and validate testing instruments and train the customers on their use. In 2011, MedTest purchased Polymedco and Charles continued his employment in the same position and at the same pay. MedTest is a diagnostic company in the business of selling general chemistry testing systems and reagents to laboratories in the United States. Around the same time, MedTest bought another company and moved its headquarters to Canton, Michigan.

In August, 2013, MedTest paid to relocate Charles and his family to Canton, Michigan. At the time of his transfer, he was offered the position of technical sales representative and he reported to his direct supervisor, Ron

Jamison, who was the head of technical services. Several months later, in January, 2014, Jamison promoted Charles to the position of technical service manager, a position that had been promised to him prior to the move. As part of his responsibilities, all technical service staff reported to him, and he would continue to report to Jamison. Although it was a promotion, his pay did not increase because his annual salary of $87,000 was already in excess of his peers in Michigan. Charles was the only African American manager at MedTest.

Charles' performance problems began in 2014. His 2014 performance evaluation noted that his communication skills were lacking, that he needed to improve his teamwork skills, and that improvement was required. Charles argues, however, that he received a 2% pay increase in 2014 as well as a bonus, thus, suggesting his raise was "consistent with exceptional performance." However, the 2% increase was consistent with his evaluation of "meets expectations." Also, his 1.5% pay raise in 2015 was the lowest of any MedTest managers because of his evaluation rating of "improvement required."

In March, 2015, Medtest hired Mark Pagels, a Caucasian, as the Senior Director of Customer Support. MedTest's CFO, Tim Allen, testified that Pagels was hired because of his vast experience managing 15-plus

people, whereas Charles lacked experience managing larger service organizations. (Doc. 19 at PgID 183). Although Charles did not receive a pay decrease, Pagels took over many of his management responsibilities. Also, Charles no longer reported directly to Jamison, but he reported to Pagels. When Charles complained about the loss of his management responsibilities, a meeting was held with Pagels and Jamison, who told him that the change was the result of his historic issues of internal and external communication, inability to work positively with other employees, and lack of reception to feedback. (Doc. 19 at PgID 431). Pagels and Charles began weekly one-on-one meetings to address concerns, and Pagels believed that Charles was not receptive to criticism. Charles testified that he was required to both train and report to Pagels. Charles alleges that the hiring of Pagels was a demotion, and that the decision to strip him of his management responsibilities and assign those duties to Pagels, was racially discriminatory.

Charles relies on four emails from Jamison and Pagels, which praised him for certain discrete tasks performed in June, 2015, December, 2017 and January, 2018. (Doc. 17, Ex. 17-20). Charles also relies on four emails from customers praising him for his performance during installations. (Doc. 17, Ex. 13-15). Charles claims he never received

written discipline or a performance improvement plan, and cites to the fact that he received a $2,500 bonus in 2014 for his "excellent performance." (Doc. 17, Ex. 10). Although he received the bonus, his 2014 evaluation by Jamison was somewhat negative, noting that Charles needed to "improve on communication skills with fellow team members and co-workers," and that action was required in teamwork and that "communications between TS [technical services] team as a group needs to improve as well as other departments." (Doc. 15, Ex. 10). The 2014 evaluation also noted that "Communication skills are still lacking." *Id.* Pagels testified that he disciplined Charles in writing five to ten times, once because a customer asked that he be removed from their account because he was condescending, accusatory, and negative towards their staff, another time because he acted unprofessionally towards another manager and threatened Pagels by shouting and pointing his finger at him. (Doc. 19 at PgID 434-35). In 2016, his superiors wanted him to engage a peer review, known as a 360, to address his performance deficiencies, but he refused to participate in the review.

In February, 2016, Charles began working part-time for one of MedTest's customers, Dr. Lesly Pompy. Shortly thereafter, Pagels discovered Charles' outside employment when visiting Dr. Pompy to assist

with training on products purchased from MedTest. Pagels testified that he was surprised to find Charles working for a MedTest customer, and that upon their run-in, Charles said, "I'm busted." (Doc. 15, Ex. 11 at 75). Although MedTest did not have a formal written policy prohibiting its employees from accepting outside employment with its customers, Pagels testified that such a prohibition was common in the industry, doing so posed a conflict-of-interest, and at the very least, showed poor judgment. Allen testified that Charles' outside employment posed a conflict-of-interest because Charles oversaw the installation of MedTest equipment from the customer's perspective, which could risk their accreditation in the lab. (Doc. 19 at PgID 197).

On March 8, 2016, Charles met with Allen and complained that the 2015 hiring of Pagels which stripped him of some of his managerial responsibilities, and his 2014 performance evaluation, were unfair, although Allen denies that Charles specifically identify racial discrimination as the reason for his low marks. Allen spoke to Jamison after their meeting, who reported that Charles continued to receive negative feedback from co-workers and customers who complained that he was condescending. The next day, Allen, Jamison and Pagels met with Charles to discuss his poor performance and recommended that he

participate in the 360 peer review process. On March 9, 2016, Charles went into the office of human resources manager, Rhonda Bloomfield, and complained of racial discrimination. In an email dated March 10, 2016, Charles refused to participate in the peer review, stating, "I've decided that a 360 survey will not benefit me based on my distrust and varied recollections of incidents from my managers." (Doc. 15, Ex. 15).

On March 25, 2016, after Allen learned of Charles' outside employment with Dr. Pompy, Allen met with Charles and Bloomfield. Allen expressed his concern that Charles' outside position presented a conflict-of-interest. According to Bloomfield's deposition, Charles complained to her of discrimination but denied that it was racially based. (Doc. 15, Ex. 16 at 29, 33-34).

Allen, with input from Pagels and Jamison, decided to terminate Charles, and notified him of his termination on March 28, 2016. The reason given for his termination was that his employment with Dr. Pompy constituted a conflict-of-interest, and he had refused to participate in the 360 peer review evaluation which was intended to address his continued performance and communication deficiencies. (Doc. 15, Ex. 13 at 45).

On May 30, 2018, after this matter had been fully briefed and the time period for filing a response having expired, Charles submitted the full

deposition transcripts of himself, Jamison, Pagels, Allen, Bloomfield, and Thaddeas as exhibits in support of his response to MedTest's motion for summary judgment. There is no explanation for the late filing of these exhibits as Charles' deposition was taken in June, 2017, and the rest of the witnesses were deposed in November, 2017. Nevertheless, the court has considered these late filed exhibits.

## II. Standard of Law

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will

a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

### III. Analysis

### A. Race and National Origin Discrimination

The court first addresses Charles' claims of race and national origin discrimination. A plaintiff asserting a race and national origin discrimination claim must produce either direct or indirect evidence of bias. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (Title VII); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462-63 (2001) (ELCRA). In this case, Charles seeks to proceed under the indirect method. For the reasons discussed below, Charles has failed to raise a genuine issue of material fact in support of his race and national origin discrimination claim. Accordingly, MedTest is entitled to summary judgment.

Absent direct evidence of discrimination, claims brought pursuant to Title VII and ELCRA are subject to the *McDonnell Douglas/Burdine* tri-partite burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981). Under this framework, the plaintiff bears the initial "not

onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine*, 450 U.S. at 253. To establish employment discrimination, a plaintiff must demonstrate that (1) he is a member of a protected class, (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was treated differently than similarly situated non-protected employees." *Laster,* 746 F.3d at 727. Should plaintiff satisfy the above elements, defendant has the burden of proving a legitimate, nondiscriminatory business reason for terminating plaintiff. *Jackson v. VHS Detroit Receiving Hosp.*, 814 F.3d 769, 778 (6th Cir. 2016). "Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* at 779. (citation and internal quotation marks omitted).

In this case, MedTest focuses on the fourth factor, and argues that Charles has failed to show that he was treated differently than similarly situated non-protected employees. In order to be similarly situated, the employees must have engaged in misconduct of comparable seriousness. *Jackson*, 814 F.3d at 777. The allegedly similarly situated employees must have "engaged in the similar conduct, without such differentiating or

mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *McMillan v. Castro*, 405 F.3d 405, 413 (6th Cir. 2005).

In response to MetTest's motion for summary judgment, Charles relies solely on the hiring of Pagels to support his race or national origin discrimination prima facie case. But the court finds it appropriate to also consider his argument that other employees were allowed to accept outside employment with MedTest's customers without repercussions, an argument he proffers to demonstrate pretext, as part of the prima facie analysis. Neither theory supports Charles' case here.

First, the court considers whether MedTest's hiring of Pagels, a Caucasian, supports his prima facie case. MedTest argues that the hiring of Pagels and assigning him some of Charles' responsibilities, is not an "adverse employment action" within the meaning of Title VII, because Charles retained the same pay, job title, rank relative to his subordinates, and did not suffer significantly diminished responsibilities. *See White v. Burlington & Sante Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004). For purposes of this motion, the court assumes without deciding that assigning some of Charles' responsibilities to Pagels constituted an "adverse employment action." Even so, Charles has failed to show that he was

treated differently than similarly situated employees, as he has not shown that any other employees with similar communication problems with co-workers did not have certain of their managerial tasks reassigned. Charles argues that because he was "excelling" in his position, the hiring of Pagels and his assumption of many of Charles' managerial responsibilities was discriminatory. But the evidence shows that Charles had communication problems with his co-workers which MedTest noted beginning in his 2014 evaluation.

Second, the court considers whether MedTest improperly singled out Charles for his outside employment with a MedTest customer, and allowed other employees to work for its customers without repercussion. Charles argues that MedTest had no formal written policy precluding outside employment that posed a risk of a conflict-of-interest. But Pagels testified that it is commonplace in the industry to forbid outside employment with a company that could influence sales, and that his prior employers at Siemens and Abbott and Bayer followed that policy strictly. (Doc. 15, Ex. 11 at 77). Charles argues that MedTest treated some employees who had similar outside employment differently: (1) Larry Noel, owns a business with his wife that deals products that are sold from MedTest; (2) Howard Lee, worked for Clinitox and owned SeroClinix, and (3) Plaintiff himself

worked part-time in another position during his time at MedTest's predecessor, Polymedco. But Charles has not shown that these individuals were "similarly situated" in "all relevant respects." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Noel's wife owns Core. Core was established by Pointe Scientific ("Pointe") as a distributor while Noel was working for Pointe. MedTest purchased Pointe with full knowledge that Noel's wife owns Core. Noel did not and does not work for the company. Lee was CEO of Clinitox when they were purchased by MedTest. Lee also owned SeroClinix, but that company was involved solely in veterinary testing, an area in which neither Clinitox nor MedTest participates as they test solely on humans. Charles' argument that he also had outside part-time employment while at Polymedco is not relevant as MedTest purchased Polymedco and was his employer when he accepted outside employment with Dr. Pompy.

Even if Charles could prove that he was treated differently than similarly situated employees, MedTest has come forward with proof that it had a legitimate nondiscriminatory reason for his discharge. MedTest has demonstrated that Charles was terminated for poor performance, for refusing to participate in the peer review process, as well as for accepting outside employment that presented a conflict-of-interest. Charles argues

that the reasons given for his termination by Allen, Jamison, and Pagels, conflict and thus establish pretext. Not so. First, Allen was the final decision maker who based his decision based on input from Jamison and Pagels. Second, the reasons given do not conflict. Jamison referred only to Plaintiff's refusal to participate in the 360 evaluation, and true enough, this was one of the reasons for his termination. Pagels referred to both his ongoing performance issues and refusal to participate in the 360 evaluation. Indeed, these were also reasons given by Allen. There simply is no inconsistency, and Plaintiff has failed to rebut Defendant's stated legitimate reasons for terminating him.

Plaintiff argues he was a stellar employee since 2011, but in fact, Plaintiff's poor performance at MedTest was noted shortly after he relocated to Michigan, and his deficient performance was noted in 2014 and 2015 prior to his discharge. Plaintiff also argues that his refusal to participate in the 360 peer review process was not a legitimate reason for his discharge as MedTest does not have a formal policy regarding that program which had not been used for other employees. But Plaintiff has not shown that other employees with similar deficiencies to him were treated more favorably, or that any other employees were asked to participate in a performance improvement process and refused to do so.

Finally, Plaintiff argues that his acceptance of outside employment for a customer was not a legitimate reason for his discharge as other employees did likewise, but were not terminated. The court has already addressed this claim and found it to be without merit. For the foregoing reasons, summary judgment shall enter for MedTest on Charles' race and national origin discrimination claims.

**B.     Retaliation Claims**

The court turns now to Charles' claim he was discharged in retaliation for making oral complaints to human resources personnel on two occasions. Title VII prohibits an employer from retaliating against an employee "because he has made a charge" of discrimination. 42 U.S.C. § 2000e-3(a). Michigan's ELCRA includes a similar provision, see Mich. Comp. Laws § 37.2701(a) which is analyzed under the same standard. *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 627 (6th Cir. 2013). As with a discrimination claim, a plaintiff can prove retaliation with direct or circumstantial evidence. Again, Charles seeks to proceed under the circumstantial method. Once again, the court analyzes the claim under the *McDonnell Douglas* framework.

Under that paradigm, a plaintiff has the initial burden to establish a prima facie case of retaliation under Title VII by establishing that: (1) he

engaged in protected activity when he made his discrimination complaint; (2) defendant knew about his exercise of the protected activity; (3) defendant thereafter took adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). If plaintiff establishes a prima facie case, the burden of production shifts to defendant to "articulate some legitimate, nondiscriminatory reason for [its action]." *McDonnell Douglas*, 411 U.S. at 802. If the defendant shows a legitimate nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove that the proffered reason was pretext for discrimination. A plaintiff can prove pretext three ways: "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation and internal quotations omitted).

Here, Charles relies entirely on the proximity in time between his complaints to human resources personnel and his referral to peer review, and termination, to prove retaliation. Although temporal proximity standing alone is not usually enough to establish causation, where the protected

activity is acutely near in time to the adverse employment action, the close proximity may be enough to permit an inference of retaliation. *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 505-08 (6th Cir. 2014). But in the usual case, in order to show a causal connection, a plaintiff must show "a temporal connection coupled with other indicia of retaliatory conduct." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364 (6th Cir. 2001). Here, Charles argues that Allen learned of his second complaint of racial discrimination on the same day Allen decided to terminate him. Charles also argues that two days after his first complaint of racial discrimination, Allen asked Charles to undergo peer review. The temporal proximity between Charles' protected activity and termination is not enough to create an inference of retaliation sufficient to survive MedTest's motion for summary judgment. Also, Plaintiff's complaints to supervisor Jamison that stripping him of his management responsibilities was unfair took place nearly one year before his termination. Even if Charles can show a close proximity between his complaints of racial discrimination and his termination, his retaliation claims under state and federal law still fail.

This is true because where an employer comes forward with proof that it had an intervening legitimate reason to take an adverse employment action against the plaintiff, this dispels whatever inference might be

gleaned from the temporal proximity of the adverse employment action and the employee's complaints of discrimination. *Kuhn,* 709 F.3d at 628. Charles' performance problems were documented some two years prior to his complaints of racial discrimination, and he began his outside employment which posed a conflict-of-interest prior to his complaints of racial discrimination. Charles has failed to show that the reasons given for his termination were pretextual. For these reasons, MedTest is entitled to summary judgment on Charles' retaliation claims.

### IV. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (Doc. 15) is GRANTED.

**IT IS SO ORDERED**.

Dated: August 21, 2018

          s/George Caram Steeh
          GEORGE CARAM STEEH
          UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 21, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk